IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ) | | |
| ) | | |
| Plaintiff, ) | | 8:08CR372 |
| ) | | |
| vs. ) | | |
| ) | | |
| JASON M. SEATON, ) | | |
| ) | | |
| Defendant. ) | | MEMORANDUM AND |
| _____ | | |
| UNITED STATES OF AMERICA, ) | | VERDICT |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | 8:08CR374 |
| ) | | |
| BEVERLY S. DOANE, ) | | |
| ) | | |
| Defendant. ) | | |

These matters are before the court following a consolidated trial on the Informations filed in the above captioned cases against Jason M. Seaton (Seaton) and Beverly S. Doane (Doane). Seaton and Doane waived trial by jury and consented to trial before the undersigned magistrate judge. Trial commenced on May 14, 2009, and concluded on May 15, 2009. Seaton was present and represented by his retained counsel, James W. Crampton. Doane was present and represented by her appointed counsel, Assistant Federal Public Defender Jessica P. Douglas. The United States was represented by Assistant U.S. Attorney Douglas R. Semisch.

Seaton and Doane are each charged with a violation of 16 U.S.C. § 3372(a)(2) and § 3373(d)(2), in that Seaton and Doane unlawfully transported a white-tailed buck deer in interstate commerce from Nebraska to Tennessee on or about November 14, 2006, and they knew or should have known such deer was taken, possessed and transported in violation of Nebraska state law and regulations. The charged violation is a Class A misdemeanor. Both Seaton and Doane entered pleas of not guilty to the Informations.

The court heard the testimony of the following witnesses for the prosecution: Frederick Funte, Robert Zegar, Kit Hams, Lee Appleby, Danny Johnson, Mark Webb, and Jon Reeves. Danny Johnson, Michael Damico, Seaton and Doane testified for the defendants. The court received into evidence Exhibit Nos. 1-19 and 21-25.

From the evidence, the court finds as follows:

## FINDINGS OF FACT

Seaton is a physically handicapped thirty-four year old man who is confined to a wheelchair with severe limitations on his upper limb movements. At the times material to these proceedings, Seaton resided in the State of Tennessee. Doane is the fifty-nine year old mother of Seaton, and, at the times material to these proceedings, Doane resided in the State of Tennessee. In 2005, Seaton, accompanied by Doane, participated in a muzzle loader hunt in Nebraska for disabled hunters, which was sponsored by Buckmasters, a national deer hunting organization. The hunt was held on Danny Johnson's (Johnson) property in the Decatur, Nebraska, area, where Johnson had a hunting lodge. Johnson was an outfitter who provided hunting grounds, lodging, and meals for hunting parties. The 2005 hunt weather was inclement, and Seaton, confined to his motorized wheelchair, was unable to fully participate with the other disabled hunters. Johnson asked Seaton to come back next year in November without the Buckmasters disabled group when, Johnson predicted, the weather would be more suitable for Seaton.

Nebraska hunting laws and regulations require a permit to hunt and kill a deer. Permits are issued for either a certain game management unit area or statewide. For 2006, the permit fee for a game management unit was approximately $178, in comparison to the statewide permit fee, which was approximately $443. Permits were obtainable from authorized outlets or through the Game and Parks Commission website. The website had information as to the Nebraska game laws and described the various game management units in the state. The Missouri unit consisted of portions of Dakota, Cedar, Knox, Pierce, Antelope, Holt, and Boyd counties, all in the uppermost northeast part of Nebraska. The Elkhorn unit consisted of portions of fifteen counties in the mid-northeast portion of Nebraska, including Burt County which contained Johnson's hunting lodge.

After his return to Tennessee, Seaton kept in telephone contact with Johnson regarding a 2006 deer hunt on Johnson's property.  Johnson's usual fee is $250 per day per hunter.  Johnson informed Seaton if Seaton could bring five people with him, Seaton could hunt for free.  Johnson instructed Seaton to use the Nebraska Game and Parks Commission website to obtain the hunting permits for Seaton's group, who would be traveling to Johnson's property for the November 2006 hunt.  In March 2006, Seaton accessed the website and discovered that nonresident permits were not available for purchase until later in the year and permits for the Elkhorn unit were sold out.  In a subsequent telephone conversation with Johnson, Seaton told Johnson the Elkhorn unit permits were sold out.  At that time, Seaton was told by Johnson to get permits for the Elkhorn or Missouri units as Johnson had access to property in each unit or to get a statewide permit, which could be used on any of Johnson's property.  However, Johnson told Seaton the access in the Missouri unit was an hour away from his Elkhorn unit property.  Seaton indicated to Johnson that the hunting party would likely have statewide permits, except for Seaton, himself, who planned on obtaining a Missouri unit permit.  In June 2006, the Nebraska Game and Parks Commission issued Missouri unit permits to Seaton and Doane (Exs. 11, 12, and 22).  No statewide or Elkhorn unit permits were issued to Seaton or Doane (Ex. 22).

One member of Seaton's prospective hunting party was Frederick Funte (Funte), who was employed as a wildlife enforcement training supervisor for the Tennessee Wildlife Resources Agency.  Funte was contacted by James Seaton, Seaton's father and a friend of Funte, to participate in the hunt.  When informed the hunt would take place in the Elkhorn unit and the Elkhorn permits were sold out, James Seaton informed Funte the outfitter informed them the game wardens did not check his operation and a Missouri unit permit would suffice.  Funte was uncomfortable with such an arrangement and would participate only if he obtained a statewide permit.  Funte initially told James Seaton that Funte was not interested because of the total cost of a statewide permit, the outfitter's (Johnson's) fee and the travel cost.  He was later contacted by James Seaton and informed Jason Seaton wanted Funte to go along on the hunt and Jason Seaton would pay

for a statewide permit for Funte. Whereupon, Funte agreed to participate in the hunt. Prior to the hunt, Funte received a statewide permit by electronic mail from Jason Seaton.

In November 2006, the hunting party traveled to Johnson's property, in Burt County, for lodging. The hunting party, except for Seaton and Doane, were taken on an ATV tour of Johnson's property to learn the hunting boundary lines. Funte shot a deer within the boundary designated by Johnson. Funte, accompanied by Johnson, took his deer to an official check-in station located near Tekamah, Nebraska, a few miles from Johnson's property. The Tekamah check-in station is the primary station for the Elkhorn unit and is located in southeast Burt County, approximately fifteen miles south of Decatur, Nebraska.

On the third day of the hunt, Funte went to get Seaton and Doane from where they were hunting on Appleby's property, located outside the boundary lines provided by Johnson. Appleby gave Seaton and Doane permission to hunt on the land after Seaton's vehicle became stuck attempting to travel to a drop point on Johnson' property. Appleby's property, in the Elkhorn unit, is approximately one and one-half miles to the southwest of the Johnson property and approximately five miles south of Decatur, Nebraska. Seaton and Doane each shot different deer on Appleby's property. The deer shot by Seaton is depicted in Exhibits 1 and 2, among others. Exhibit 8, among others, depicts the deer shot by both Seaton and Doane. At the time Seaton and Doane were preparing the take their deer to a check-in station, Funte approached the party and all conversation ceased. Seaton and Doane were gone from the hunting party for approximately one and one-half hours, when they went to check in their deer. Seaton and Doane went to the Dakota City check-in station (Ex. 9). The Dakota City check-in station is located in Dakota County, near the border between the Missouri unit and the Elkhorn unit, approximately thirty miles north of Decatur, Nebraska. After the deer were check-in, they were processed by James Seaton on Johnson's property. The processing included skinning the deer and removing their skull plates with antlers. With the antlers, the meat from these deer was harvested and was transported to Tennessee, in coolers purchased in Nebraska, when Seaton and Doane returned to Tennessee.

United States Fish and Wildlife Service Special Agent Mark Webb (Agent Webb) received information about possible wildlife violations associated with the Johnson

property, including both Seaton and Doane hunting on Elkhorn unit property with Missouri unit permits. On May 16, 2007, Agent Webb interviewed Seaton in Tennessee, with Doane present, and executed a search warrant in Tennessee associated with the allegations. Agent Webb conducted the search at James Seaton's residence, which has a taxidermy shop on the same property. Agent Webb arrived early in the morning with one other agent from Nebraska, two Tennessee agents, and one Tennessee conservation officer. Agent Webb was wearing plain clothes, but he had a firearm, which was probably visible. Agent Webb did not draw his firearm at any time during the search or interviews. With the assistance of James Seaton, Agent Webb found parts of the deer taken from Nebraska in the taxidermy shop. Specifically, Agent Webb seized a 4-by-4 whitetail buck deer rack (antlers) with a metal seal that corresponded with the same seal number placed on a deer checked in by Seaton, with a Missouri unit hunting permit issued to Seaton, at the Dakota City, Nebraska check-in station (Ex. 18). Initially, neither Seaton or Doance were present for the search. However, Agent Webb called Seaton and Doane to request their presence.

      Seaton and Doane arrived together in a van during the search. Agent Webb went outside to meet them. Agent Webb introduced himself, displayed his credentials, and explained the nature of the investigation. Agent Webb asked Seaton and Doane if he (Agent Webb) could interview them in reference to their role in the Nebraska hunt. Agent Webb did not advise Seaton or Doane of their ***Miranda*** rights and had no intention of making an arrest. Agent Webb advised Seaton and Doane they were not under arrest and were free to leave. Agent Webb did not use promises or threats to obtain Seaton or Doane's cooperation. Seaton and Doane agreed to participate in an interview. Seaton and Doane remained in the van during the interview, with Seaton seated in his wheelchair behind the driver's seat and Doane in the driver's seat. Agent Webb stood outside the van for part of the interview and seated himself on the floor of the van with his legs outside. Agent Webb never raised his voice or approached Seaton or Doane. Seaton and Doane were very friendly, easygoing, and open, and extremely cooperative in providing information about the Nebraska hunt. Seaton also described how he was able to hunt and his enthusiasm for hunting. Seaton stated he had purchase the hunting permits for the

hunting party, including a Missouri unit permit for himself because the Elkhorn unit permits were sold out and the statewide permits wee too expensive. Seaton acknowledged killing a deer on the Appleby property, in the Elkhorn unit, during the 2006 Nebraska hunt. Further, Seaton told Agent Webb that Johnson had directed Seaton to use the Dakota City check-in station because Seaton had a Missouri unit permit. Although Seaton seemed concerned about talking to law enforcement, he was easygoing and polite. Seaton did not refuse to answer any question, ask to stop the interview or ask for an attorney to be present. Seaton's demeanor did not change during the course of the interview. Doane was more reserved and indicated she did not have as much knowledge about the specifics because she was at the Nebraska hunt primarily to assist her son. However, Doane provided some comments about the events. Doane did not stay in the van during the entire interview, but left occasionally to smoke or to talk on the telephone with her friend or with James Seaton. With Seaton's agreement, Agent Webb made a written document based on his conversation with Seaton. Seaton and Doane both stated they agreed the facts written in the document were true. Doane signed the document on Seaton's behalf and initialed several areas to indicate a change or the end of the document (Ex. 19). The interview process lasted forty-five minutes to one hour. Seaton told Agent Webb:

> I was aware that I was not in the Missouri River Deer Management Unit. D. Johnson told me that we would need to drive to Dakota City, NE to check our deer in, as it is in the Missouri unit. Dan Johnson told me that we would need to check all deer at Dakota City, as that is the area the permits were issued for. We did not hunt in the Missouri unit. We only hunted in the Elkhorn unit. Dan Johnson told us not to worry about the local game warden, as he rarely showed up around their area.

Ex. 19.

Doane told Agent Webb the antlers from her deer were at her residence. Doane offered to lead Agent Webb to her residence. Doane and Agent Webb drove to Doane's residence, which she shared with Seaton, in separate vehicles. Seaton and Doane invited Agent Webb inside. While at Doane's residence, Agent Webb inspected Seaton's rifle, spoke with Doane's brother, and read a newspaper article about Seaton's Nebraska hunt (Ex. 23). The antlers provided by Doane had a metal seal that corresponded with the

same seal number placed on a deer checked in by Doane, with a Missouri unit hunting permit issued to Doane, at the Dakota City, Nebraska check-in station (Ex. 17). Agent Webb was at the Doane residence for approximately fifteen to twenty minutes.

## CONCLUSIONS OF LAW

The defendants do not dispute they shot and killed deer located in the Elkhorn unit when the defendants had permits allowing hunting in the Missouri unit only (TR. 365, 372). Accordingly, the issue before the court is whether these defendants knowingly did so, and transported the meat and antlers across state lines. The defendants were indicted under 18 U.S.C. § 2 and 16 U.S.C. § 3372(a)(2) and § 3373(d)(2) on the basis that they knowingly and unlawfully transported wildlife in interstate commerce from Nebraska to Tennessee, when in the exercise of due care they did know and should have known the wildlife was taken, possessed and transported in violation of the laws and regulations of Nebraska, specifically Neb. Rev. Stat. §§ 37-411 and 37-613(1).

Pursuant to § 3372,

> It is unlawful for any person--
> (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce--
> (A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law;

16 U.S.C. § 3372(a)(2).

Furthermore,

> Any person who knowingly engages in conduct prohibited by any provision of this chapter . . . and in the exercise of due care should know that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation shall be fined not more than $10,000, or imprisoned for not more than one year, or both. Each violation shall be a separate offense and the offense shall be deemed to have been committed not only in the district where the violation first occurred, but also in any district in which the defendant may have taken or been in possession of the said fish or wildlife or plants.

16 U.S.C. § 3373(d)(2).

Under Nebraska law it is unlawful for a nonresident to hunt game animals with a resident permit illegally obtained. Neb. Rev. Stat. § 37-411(2). Additionally,

> (3)  It shall be unlawful for anyone to do or attempt to do any other thing for which a permit is required by the Game Law without first obtaining such permit and paying the fee required.
>
> (4)  Any nonresident who hunts or has in his or her possession any wild mammal or wild bird shall first have a nonresident hunting permit as required under the Game Law and rules and regulations of the commission.

Neb. Rev. Stat. § 37-411(3)-(4).

Additionally, Nebraska law provides a penalty for a violation under the statute:

> Any person who sells, purchases, takes, or possesses contrary to the Game Law any wildlife shall be liable to the State of Nebraska for the damages caused thereby. Such damages shall be:
>
> * * *
>
> (c)  Seven hundred fifty dollars for each deer, antelope, bear, swan, or paddlefish;

Neb. Rev. Stat. § 37-613(1).[1]

Under the Nebraska Administrative Code, Nebraska Game and Parks Commission Wildlife Regulations for the time relevant period, it was unlawful "to take antelope, deer, elk, mountain sheep or turkey in any area other than the management unit or season choice area for which the permit is issued." **See** Ex. 24 Title 163, Ch. 4 § 001.01B11. Statewide permits are valid for the entire state except for Federal and State sanctuaries. *Id.* Ex. 25 Title 163, Ch. 4 § 003.05B. Otherwise, management unit boundaries are described in Title 163, Ch. 4 § 003.05F, including the Elkhorn unit (§ 003.05F6), which includes Burt County, in its entirety, and the Missouri unit (§ 003.05F11). **See** *id.*

---

[1] The relevant portion of the statute was amended effective August 30, 2009, to read: "(c) Five thousand dollars for each whitetail deer with a minimum of eight total points and an inside spread between beams of at least eighteen inches, one thousand dollars for any other antlered whitetail deer, and two hundred fifty dollars for each antlerless whitetail deer and whitetail doe deer."

The evidence at trial clearly establishes Seaton and Doane shot and killed deer located in the Elkhorn management unit.  Furthermore, these defendants did not have hunting permits for the Elkhorn management unit.  The defendants argue they did not know in which unit they were hunting when they shot the deer, but relied on others when they assumed they were in the Missouri unit with valid Missouri unit permits.

The government has the burden of establishing of proving, beyond a reasonable doubt, each essential element of the crime charged.  At issue in this case, the government has the burden of establishing the defendants "in the exercise of due care should know" that the wildlife was taken or possessed in violation of sate law.  **See** 16 U.S.C. § 3373(d)(2); *United States v. LeVeque*, 283 F.3d 1098, 1106 (9th Cir. 2002).  "Thus the misdemeanant must have actual knowledge that he is importing or exporting the animals, etc., but need not know that they were taken or possessed illegally, so long as in the exercise of due care he should know." *United States v. Santillan*, 243 F.3d 1125, 1129-30 (9th Cir. 2001).  The government argues the defendants should have known about the unit hunting restrictions imposed by their permits by virtue of the easy access to the relevant information, the comments made by Funte and Johnson, the defendants' own conduct prior to the hunt, and the defendants' general experience as hunters.  The defendants argue they relied on others, particularly Johnson, to take them to land compatible with their hunting permits.  Furthermore, Doane contends she relied on her son, Seaton, who purchased and provided Doane's permit and organized the hunting trip.

The court finds the government has met its burden of proof beyond a reasonable doubt that Seaton knew or should have known he was hunting in the Elkhorn unit with a Missouri unit permit.  The evidence shows Seaton discussed the permits with Johnson prior to purchasing them.  Seaton knew the Elkhorn unit permit was not available for any member of his hunting party.  Seaton had ongoing discussions with Johnson about where Johnson had property and that, even though Johnson had property available in the Missouri unit, hunting in the Missouri unit would not be near the lodging.  Seaton purchased a statewide permit for Funte after Funte expressed concerns about the location of the planned hunting area.  The statewide permit was more expensive than each of the unit permits.  Seaton accessed the website on at least six occasions to review permit

availability and to purchase permits. The website contained information about the unit boundaries and Nebraska hunting regulations. Under the circumstances, the evidence shows Seaton knew or in the exercise of due care should have known he would be hunting, was hunting, and killed a deer in the Elkhorn unit with a Missouri unit permit, in violation of state law.

In contrast, the evidence does not support a finding beyond a reasonable doubt that Doane knew or should have known, in the exercise of due care, that she was hunting in the Elkhorn unit with a Missouri unit permit, in violation of state law. Doane was not involved in planning the hunt or purchasing permits. Doane relied on her adult son to purchase her permit. Doane knew she had to have a permit and that it was a Missouri unit permit. There is no evidence, however, Doane knew she was hunting in a unit other than the Missouri unit. Further, the record contains no evidence Doane had information that any member of the hunting party or Johnson would have been concerned about the type of hunting permit she possesses. Accordingly, the court finds Doane not guilty of the charge against her.

The government has the burden of establishing Seaton knowingly transported wildlife in interstate commerce, which was possessed in violation of the laws and regulations of Nebraska. The government contends the evidence shows that although Seaton may not have physically participated in dressing the deer, Seaton knowingly caused the meat and antlers to be transported to Tennessee. Seaton contends he did not participate in skinning, packaging, or hauling the deer. However, Seaton admitted he wanted to keep the meat for food and the antlers as a souvenir of the hunting trip at places in Tennessee. The court finds Seaton willfully caused the transportation of the unlawfully obtained deer. In conclusion,

1. Jason M. Seaton's and Beverly S. Doane's motions for judgment of acquittal, made during trial, are denied.

2. In accordance with Federal Rule of Criminal Procedure 23(c), the Court finds that the Defendant, Jason M. Seaton, is guilty of Count I of the Information, as each element of Count I has been proved beyond a reasonable doubt. Specifically, I find that

in November 2006, Jason M. Seaton, knowingly transported wildlife in interstate commerce from Nebraska to Tennessee, when in the exercise of due care he should have known the wildlife was taken, possessed and transported in violation of the laws and regulations of Nebraska.

3.   In accordance with Federal Rule of Criminal Procedure 23(c), the Court finds that the Defendant, Beverly S. Doane, is not guilty of Count I of the Information, as each element of Count I has not been proved beyond a reasonable doubt.

4.   Judgment will be entered accordingly.

DATED this 25th day of September, 2009.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.